IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MICHAEL AND SHELBY            )
BELCHER, et al.               )
                              )
v.                            ) NO. 3-13-0161
                              ) JUDGE CAMPBELL
ROBERTSON COUNTY,             )
TENNESSEE, et al.             )

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

### INTRODUCTION

This lawsuit was brought by the parents of three children who were students at East Robertson County Elementary School ("the School") during the relevant time period. The action arises from alleged peer-on-peer sexual abuse which occurred at the School. Plaintiffs allege claims against the Robertson County Board of Education and Robertson County, Tennessee (collectively "Defendant") under Title IX (20 U.S.C. § 1681, *et seq.*); 42 U.S.C. § 1983 (failure to train); and the Tennessee Governmental Liability Act (negligence). The case was tried without a jury on September 23, 24, and 25, 2014, and the parties filed post-trial briefs (Docket Nos. 73 and 76).

### FACTS

**ML**[1]

At all relevant times, ML was a student at the School. He is the alleged perpetrator of sexual abuse against two of the minor children in this action, MB and BE. ML's guardian told the

---

[1]     The children in this case are identified by their initials to protect their privacy.

Department of Children's Services ("DCS") that the "sexual stuff" with ML had been going on since he was four years old. Tr. 2 (Docket No. 68) at p. 274; Trial Ex. 44.[2] ML had a history of inappropriate touching while in the Robertson County School System. There was evidence at trial that, while in preschool, ML had touched a little girl's "privates" during nap time. Tr. 2 at p. 15; Tr. 3 (Docket No. 69) at p. 160; *see also* Trial Ex. 44, p. 6 of 6. Although the preschool is not at East Robertson Elementary, it is a part of Defendant's school system. Tr. 3 at p. 161.[3]

ML's kindergarten teacher testified that, on at least two occasions, ML hit a female student in her private area. Tr. 2 at pp. 65-67, 69. The kindergarten teacher said she reported one of the incidents to the School guidance counselor, who talked with both ML and the girl. *Id*. at p. 67. Neither the teacher nor the School reported these incidents to DCS. *Id*. at 69.

ML's first grade teacher testified that she was not made aware of ML's inappropriate behavior in kindergarten and stated that "children's information is supposed to be confidential and is on a need-to-know basis." Tr. 2 at pp. 182-83. In the fall of 2011, ML's teacher began keeping ML and two other boys (MB was one) with her at all times. *Id*. at pp. 187-88. She told her substitute teacher not to let these children out of her sight. *Id*. at p. 104.

In first grade, ML received at least two in-school suspensions ("ISS"), one isolation, and one full suspension from the School between November 14, 2011 and February 10, 2012, for "immoral or disreputable conduct" and disruptive behavior.[4] Trial Ex. 22. The ISS note for November 14,

---

[2] References to the three volumes of the trial transcript (Docket Nos. 67, 68 and 69) will be identified by the numbered transcript (1-3) and the CM/ECF page number within that particular volume. References to trial exhibits are identified as Trial Exs.

[3] The School principal testified that she had no knowledge of ML's behavior from preschool until this lawsuit began. Tr. 3 at p. 161.

[4] It is undisputed that ML was diagnosed with ADHD. Tr. Ex. 44, p. 2 of 6.

2011, states: "[ML] was punching others in their private area. He also pulled another child out of their chair." Trial Ex. 21. The November 18, 2011 ISS note states that ML was touching and hitting other students, "on-going problem." *Id*. Defendant suspended ML from school on February 10, 2012, for immoral and disreputable conduct. Trial Ex. 22.

ML was admitted to Vanderbilt Psychiatric Hospital on March 28, 2012. Trial Exs. 12 and 29. ML's mother brought him to the hospital "for increasing aggression at home and at school" and she also reported that he had been "grabbing his genitalia during school." Trial Ex. 29. The DCS intake summary states that ML touched two other children at school and gives the first names of the "other children," one of whom is MB. Trial Ex. 12. The psychiatric admission evaluation from Vanderbilt also reports that ML admitted he touched himself at school and also touched the genitalia of two other boys while at school (and listed the names of MB and another child). Trial Ex. 29. That evaluation form states that ML's mother's biggest concern was sexual inappropriate behavior by ML touching other kids at school. *Id*.

The Vanderbilt discharge summary dated April 5, 2012, indicates that ML was observed to be anxious, hyperactive and distracted. Trial Ex. 27. The discharge summary notes that ML has a history of inappropriate sexualized behaviors toward schoolmates, although no inappropriate or sexualized behaviors were noted during this hospitalization, aside from some inappropriate sexualized play with action figures. *Id*. The discharge summary states that both his aunt and his mother expressed concern about ML's sexually acting out behaviors at home and at school. *Id*.

ML was readmitted to Vanderbilt Psychiatric Hospital three days after the first discharge. Trial Ex. 28. The second discharge summary, dated April 18, 2012, indicates that ML exhibited hyperactivity and hyperarousal and that he seemed to be sexually focused and had poor boundaries

with peers. *Id.* During this hospital course, ML was monitored because of "his history of inappropriate sexualized behaviors toward other children." Inappropriate sexualized behaviors were noted during this hospitalization, including some inappropriate sexualized comments and gestures toward peers, such as reportedly kissing another male peer. *Id.* The summary states that DCS was made aware of the hospital's concerns about the risk ML posed to other children given his impulsive and sexualized behaviors. *Id.*

When ML returned to the School, there was a Safety Plan in place for him, which provided that he would be supervised at all times while at the School. Trial Ex. 4.

During the fall semester of his second grade year,[5] ML had three ISS referrals for "immoral or disreputable behavior," "other threats," and "vulgar, obscene or pornographic images." Trial Ex. 22. On August 16, 2012, ML was suspended from the school bus for three days for hitting a female student in the face. Trial Ex. 31. On September 12-13, 2012, ML was suspended from the school bus for the rest of the year for inappropriately touching the bottom of a female student. Trial Exs. 24 and 31.

**WJ**

WJ is the alleged perpetrator of sexual abuse against another child, JA. WJ had been a victim of sexual abuse by ML. Trial Ex. 38; Tr. 1 at p. 198. WJ's teacher testified that she had no problems with WJ bullying other children or acting out sexually. She stated that WJ was not a difficult student in class in any regard. Tr. 2 at p. 95.

---

[5]     All of these incidents in the fall of 2012 happened *after* the Safety Plan for ML had been put into place.

JA's mother testified that WJ sexually harassed JA during both his first and second grade years at the School.  Tr. 1 at pp. 192-96.  For example, WJ "humped" JA's backpack and leg while they were in the car rider line on more than one occasion.  *Id.* at p. 190. In addition, JA reported that, while they were in the classroom watching a movie, WJ touched and rubbed his genitals while making sexual noises *(Id.* at p. 192) and also that WJ put his private on JA's head and rubbed it on JA's head on the playground. Trial Ex. 38.

**MB**

MB's mother testified that in November and December of 2011, MB became very "whiney" at home and did not want to go to school.  Tr. 1 at pp.114-15. MB's parents went to talk with MB's teacher, who told them MB was fine in class and was not a discipline problem.  *Id.* at 115. MB's teacher never mentioned to the parents that MB and another child (ML) were being segregated from the rest of the children or why, although in the fall of 2011, they were being required to stay with the teacher at all times.  *Id.* at p. 116; Tr. 2 at p. 188.[6]

MB's mother testified that in April of 2012, she received an "alarming" phone call [7] from the assistant principal at the School. The assistant principal told MB's mother that she (the mother) needed to question MB and ask him if anything inappropriate had happened during school hours.  Tr. 1at p.118. MB's mother testified that when she asked MB about it, he seemed very

---

[6]     In fact, MB's teacher instructed her substitute teacher not to let these boys out of her sight. Tr. 2 at p. 104.  She told the substitute teacher that, even if she went to the bathroom, she was to have another adult watch those three students, and if she walked to the office, those three students were to go with her.  *Id.*  She never told the substitute teacher why.  *Id.*

[7]     This phone call came after ML had been at Vanderbilt Psychiatric Hospital and had admitted inappropriate touching of MB and another child, but the School did not tell MB's mother about that report.

uncomfortable, said nothing had happened, and said he did not want to talk about it. *Id*. at pp. 119-20. MB's mother went to the School the next day to discuss the situation with the principal, who stated, "Well, it's really no big deal." The principal told her they were just following up, checking with parents to see how the school year had been. *Id*. at pp. 120-21. MB's mother testified that the principal never mentioned any alleged abuse, never explained what she meant by "inappropriate," never identified what prompted the phone call, and never told her about the Vanderbilt report. *Id*.

MB's mother filed a complaint with the Robertson County Board of Education, and the director of human services told her that they were protecting the rights and privacy of another student, and they couldn't help her. Tr. 1 at p. 122. No one from the Board of Education ever called MB's parents back about the complaint. *Id*. at p. 123. Finally, MB's parents contacted the Robertson County Sheriff's Office and turned the problem over to them because they could not get answers from the School or the Board of Education. *Id*. at p. 124. MB's mother testified that the detective from the Sheriff's Office contacted DCS and filed a complaint on their behalf. *Id*.

Also in the spring of 2012, MB had a "panic attack," according to his mother, and begged her not to make him go to school. Upon further questioning, MB reported to his mother than a classmate, ML, "had done bad things" to him. Those things included coming up behind MB, pinning MB's arms down, grabbing MB's penis and rubbing, and "humping" MB's back and leg. Tr. 1 at pp. 126-27. MB told his mother that ML would do these things when they were lining up to go places and that this behavior had been going on "since he had to wear his heavy coat," which his mother assumed to be late fall or early winter of the previous year. *Id*. at pp. 126-27.

Believing that her child was not safe at the School, MB's mother kept him at home, and he never went back to East Robertson other than to take his final testing. Tr. 1 at p. 131. Defendant denied MB homebound teaching during this time because it said there was no reason for MB to be absent from school. *Id.* Defendant did state that MB could attend any other school in the county for the final three weeks of the school year. *Id.* at pp. 131-32. MB's parents took him to counseling and  placed him in a smaller, private school, where he remained at the time of the trial. *Id.* at pp. 133-34.

Later, MB told his mother that he and ML and another child were being separated from the other children, segregated from the class and required always to stay in the presence of a teacher, being constantly monitored. Tr. 1 at pp.116-17 and 138.  Even when the teacher had to leave the classroom, she took these three boys with her.  *Id.* at 141. In other words, MB and the alleged abuser were placed together, with the teacher, separated from the rest of the class, at all times. No one from the school told MB's parents about this segregation. MB's teacher later told his mother that the boys were always with her because "some children were rambunctious."  *Id.* at p.138-140. The teacher also told MB's parents that MB was not a problem.  *Id.* at p. 141.

MB's parents testified about the change in their child as a result of the alleged abuse by ML. They stated that MB used to be a happy, carefree, social and active boy; but after the abuse, he became fearful, whiney, serious and more secluded. Tr. 1 at pp. 135-36, 178-181.  His mother stated that MB did not understand why he had to leave the School when ML got to stay. *Id.* at p. 136.

MB's mother did not tell the school principal or assistant principal what MB had reported to them; she told "the authorities."  MB never told anybody at the School that he was touched inappropriately, Tr. 1 at pp. 143 and 169-70.

**<u>BE</u>**

BE was a student at the School who reported being sexually assaulted by ML in the computer lab during her second grade year, the fall of 2012. BE's mother testified she received a phone call from the vice principal that "something" allegedly had happened and that she had to call BE into the office. The vice-principal told BE's mom that she had BE in the office just to talk to her; BE was not in trouble.  Tr. 1 at p. 12. BE's mom asked her what happened, and the vice-principal said that nothing happened and she could not discuss it.  *Id*. at pp. 12-13.

When BE came home from school, she was very upset and told her mother that the students were sitting "criss-cross applesauce" (Indian style) in the computer class and the teacher left the room.  Tr. 1 at pp. 16-17. BE said that ML put his head between her legs and was trying to lick her vagina.  *Id*. at p. 16.  BE stated that she tried to get away, but ML pushed toward her until another boy grabbed him and told him to stop. *Id*.  BE said that ML actually licked her pants.  *Id*.

The computer lab teacher reported that she was gone from the room only 60 to 90 seconds and when she returned, a student told her that ML tried to lick BE's private parts.  Trial Ex. 26(j). The teacher made ML and BE apologize to each other and to the entire class. Then she told the students, including the child who reported it, to "drop it." *Id*. BE stated that the teacher told the students not to talk about it or they would get in trouble.  Tr. 1 at p. 17.

The incident involving BE occurred in September of 2012, after the Safety Plan for ML had been put into place. The teacher left the room despite the Safety Plan's requirement that ML be supervised at all times and be taken with the teacher if she had to leave the room. The computer lab teacher signed the Safety Plan, indicating that she read it and agreed to strictly adhere to its parameters. Trial Ex. 20. Although isolating ML had failed to work prior to the Safety Plan, and

monitoring ML was obviously failing to work in this instance, Defendant did not change the Safety Plan or reconsider further interventions to prevent ML's inappropriate touching after this incident with BE.

BE's mother testified that BE came home upset for days after that because everybody was making fun of her. BE continued to resist going to school and went from a happy, confident little girl who loved to go to school to an insecure and angry child. Tr. 1 at pp. 19 and 21-22. Her parents removed her from the School because she "was getting tormented" and nothing was happening or changing to fix it. *Id.* at p. 22. Her parents moved her from the School in January of 2013 to Gateview Elementary in Sumner County. *Id.* As with MB, BE felt as if *she* did something wrong and was being punished because ML got to stay at the School and she did not. *Id.* at p. 23.

**JA**

JA's mother testified that JA was sexually harassed by another student, WJ,[8] during both his first and second grade years at the School. Tr. 1 at pp. 192-96. JA reported to his mother, in October of 2012, that WJ had "humped" his backpack and his leg while they were in the car rider line at school. *Id.* at p. 190. A short time later, JA told his mom that, while the students were watching a movie in the classroom, WJ had touched and rubbed his genitals while making sexual noises. *Id.* at pp. 191-92. JA told the teacher what had happened, and, in the presence of the other children, she told both boys that they needed to separate. *Id.* at p. 192-93.

JA later explained to his mom that these behaviors of WJ had been going on since first grade. Tr. 1 at p. 195. He told her that WJ would hold his hands down by his side, grab his privates,

---

[8]     WJ reported to a DCS worker that two other boys, including ML, had sexually abused him. Tr. 1 at p. 198; Trial Ex. 38.

his genitals, and start making sexual noises. *Id.* JA also stated that WJ would hump JA's back, rubbing his front part against JA's back. *Id.* These behaviors happened in the car rider line and on the playground, in addition to the classroom. *Id.* at 196. In a November 2012 forensic interview with someone from DCS, JA stated that WJ put his private on JA's head and rubbed it on his head while on the playground. Trial Ex. 38. JA told her that these incidents happened a lot in first grade and four or five times so far in second grade. *Id.*

JA's parents reported these incidents to detectives at the Sheriff's Department, and there was a DCS referral. Tr. 1 at pp. 193-94 and 196. JA's mother testified that she also reported what JA had told her to the principal at the School, who said she knew nothing about it. *Id.* at pp. 200-01. The principal stated that she would separate the two boys on the playground, in the line and in the classroom. *Id.* at p. 201. JA's mother testified that was not good enough for her. *Id.* Defendant offered to let JA go to a different school within Robertson County, and the parents moved him to White House Elementary. Tr. 3 at p. 77.

JA's mother testified that the inappropriate behavior of WJ had a severe impact on her son and that JA had been going to a counselor. Tr. 1, pp. 202-03. That counselor testified that JA reported having issues with a young man in his classroom and told her about three incidents with WJ - humping his backpack and his leg; grabbing his hand in the classroom and forcing him to put it on WJ's leg; and straddling JA at the top of the slide and rocking his private area over JA's head. Tr. 3 at p. 49. JA was still seeing the counselor at the time of trial. *Id.*

**THE SCHOOL**

ML's preschool teacher reported to DCS that ML had put his hands on a little girl's privates while it was nap time and she had to call the girl's mother. Ex. 44, May 11, 2010 report. In

kindergarten, ML's teacher knew that ML had kneed a little girl in her private area more than once. Tr. 2 at pp.65-67; Trial Ex. 19; *see also* Tr. 2 at pp. 109-111.  She reported one of the incidents to the School guidance counselor, who talked with both ML and the girl.  *Id*. at p. 67. Neither the teacher nor the School reported these incidents to DCS.  *Id.* at 69. [9]

The kindergarten girl's mother testified that she told ML's teacher that ML was touching her daughter inappropriately, and she asked that either her daughter or ML be removed from the class. Tr. 1 at pp. 110-11. The School did not agree to remove one of the two children from the class.  *Id*. at p. 111.

ML's first grade teacher knew that his kindergarten teacher had had trouble with ML.  Tr. 2 at p. 182. She was never told, however, about the inappropriate touching. *Id*. at pp. 182-83. She testified that teachers are told that children's information is supposed to be confidential and it is on a "need-to-know basis."  *Id*. at p. 183. When the three boys, including MB and ML, were required to stay with her, no matter where she went,  singled out and segregated from the other children, the teacher never told MB's parents about that practice.  *Id*. at p. 188.

ML's first grade teacher also told a substitute teacher about not letting these three children out of her sight. Tr. 2 at p. 104.  She told the substitute teacher that the three students were to be in her view at all times, but she did not tell the substitute teacher why.  *Id*.  She later told the substitute

---

[9]    The school guidance counselor testified that teachers were supposed to report when they learn of a potential sexual abuse situation. Tr. 2 at p. 124.  She also testified that no counselor in the county reported child-on-child abuse.  *Id*. at 125.  That situation, she said, was usually handled through the parents, contacting the parents and making them aware of the situation.  *Id.* Yet, here, the parents were either not contacted at all or they were contacted but given inaccurate and/or incomplete information.

that the principal had said, "You are on a need-to-know basis, and this is all you need to know, that these kids need to be with you at this time." *Id*. at p. 105.

After ML was hospitalized in the spring of 2012, a DCS caseworker told the School officials about the allegations of inappropriate touching and that ML had identified two children by first name whom, he admitted, he touched inappropriately. Tr. 2 at p. 30. She characterized the information as "a severe abuse allegation." *Id.* at p. 59. On April 19, 2012, the School held a Student Support Team Meeting concerning ML. Trial Ex. 1. The summary of that meeting states that, based on information provided by ML's teacher and the guidance counselor, concerns were brought to the School's attention that ML needed to be closely supervised and monitored at school. *Id*. [10]

At that meeting, School employees discussed ML's need for constant supervision because of the inappropriate behavior reported by Vanderbilt. Tr. 3 at p. 176. They discussed the names of the two children ML said he had inappropriately touched. *Id.*

The Safety Plan for ML provided that ML would be supervised at all times while at school. Trial Ex. 4.[11] If ML were in a classroom and the teacher walked out and left him alone, that would be an express violation of the safety plan. Tr. 2 at p. 195. Defendant required everyone in contact with ML in first grade to sign off on the Safety Plan and then required the same for those with whom he would come in contact in second grade. Tr. 3 at p. 267.

---

[10] This meeting came in response to the Vanderbilt disclosures, but employees of the School already knew about inappropriate touching by ML in preschool, kindergarten and first grade.

[11] The school guidance counselor testified that the plan they put into place was to keep ML isolated. ML's teachers knew, however, and the Functional Behavior Assessment reported, that separation from others did not work. Tr. 2 at p. 130; Trial Ex. 43.

The Safety Plan also stated that all information regarding ML would be kept confidential. Trial Ex. 4. Therefore, the parents of the children in the classroom, even the parents of earlier "victims," were never told about this Safety Plan. Moreover, teachers were not told about the reasons for Safety Plan, just that they should keep close supervision of ML. *See, e.g.,* Tr. 2 at pp. 80-81 (teacher supervising ML on the playground not told by anyone what specific safety concern ML's plan was designed to address, and teacher said it was none of her business).

In the "alarming" phone call to MB's mother (referenced above), the vice principal refused to tell her why she needed to question MB. When MB's mother went to see the principal the next day, the principal refused to tell her the truth about ML and the alleged inappropriate touching. When MB's mother filed a complaint with the Director of Schools, he never called her back.

After the incident involving ML and BE, the teacher made ML and BE apologize to each other and to the class.[12] She also told the class she wanted it dropped. In other words, the teacher had the victim, BE, apologize to the perpetrator, ML, in front of all the other children. Then she told the students, including the child who reported it, to "drop it." The teacher told the students not to talk about it or they would get in trouble. Then, the next day, the principal interviewed every child in the classroom about what happened. Tr. 2 at p. 248. Yet BE's mother testified that no one associated with Defendant ever called her back. "It was like they didn't want to talk about it, acted like it didn't happen." Tr. 1 at p. 26.

After JA's parents reported the sexual abuse by WJ in the fall of 2012, the principal and teacher separated the two boys on the playground, and both boys were required to stay within

---

[12]     The guidance counselor at the School testified that she would not question a child who had reported inappropriate touching in front of the class or make that child apologize. Tr. 2 at p. 124.

designated areas.  Tr. 2 at p.90.[13]  In other words, JA, the victim, was singled out and his movement

on the playground was restricted, just like WJ, the perpetrator.  JA's teacher agreed at trial that this

separation and restriction made JA conspicuous and could signal to the child that he should not have

told anyone about the touching.  *Id*. at pp. 90-91.

JA's teacher questioned JA and WJ in the presence of the class.  Tr.1 at p. 531.  She also

expressed frustration at having to meet with the DCS worker about the incident with JA and WJ.

Trial Ex. 38.  She "was very upset and yelled that she could not believe CPSI Beckham was there

to look into 'that.'"  *Id*.  JA's parents reported to DCS that they were concerned about the lack of

notification and information from the school.  Trial Ex. 38.

## CONCLUSIONS OF LAW

### TITLE IX

Title IX provides that no person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving federal financial assistance.  20 U.S.C. § 1681(a).  It is well

settled that a student may pursue an action under Title IX for student-on-student sexual harassment

against a state educational entity that receives federal funding.  *Mathis v. Wayne County Bd. of

Educ.*, 782 F.Supp.2d 542, 549 (M.D. Tenn. 2011).

Schools are properly held liable only where they are deliberately indifferent to sexual

harassment, of which they have actual knowledge, that is so severe, pervasive and objectively

offensive that it can be said to deprive the victims of access to the educational opportunities or

---

[13]	JA's teacher told his mom that she just separated them and "thought nothing more about it."  Tr. 1 at  201.

benefits provided by the school. *Lopez v. Metropolitan Gov't of Nashville and Davidson County*, 646 F.Supp.2d 891, 913 (M.D. Tenn. 2009) (citing *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999)). A school is liable for acts of student-on-student harassment where the school's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances. *Lopez*, 646 F.Supp.2d at 913.

To establish a Title IX claim for student-on-student harassment, a plaintiff must show that (1) the sexual harassment was severe, pervasive, and objectively offensive, such that it deprived the student of access to the educational opportunities or benefits provided by the school; (2) the school had actual knowledge of the sexual harassment; and (3) the school was deliberately indifferent to the harassment. *Mathis*, 782 F.Supp.2d at 549. The Sixth Circuit has concluded that one sufficiently severe incident of sexual harassment could satisfy a claim under Title IX. *Id.* (citing *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 259 (6th Cir. 2000)).

The Court finds that the harassment by ML was severe, pervasive and objectively offensive. Hitting a little girl in her private area multiple times is severe and objectively offensive. The numerous in-school suspensions, isolation, and full suspension for "immoral or disreputable conduct," punching others in their private area, touching and hitting other students, including more than once on the school bus, having "vulgar, obscene or pornographic images" - these actions are severe and objectively offensive. Multiple acts of touching, rubbing and "humping" MB are severe and objectively offensive. Putting his head between BE's legs and trying to lick her vagina is severe and objectively offensive. All these acts together, for a period of years, were pervasive. With regard to WJ, inappropriately touching, rubbing and "humping" JA numerous times in first and second grade is severe and objectively offensive. Despite minimizing by the Director of Schools (Tr. 3 at

p. 78) and the teachers (Trial Ex. 38), the actions of these two boys were sexual, severe, pervasive and objectively unreasonable.

To be liable, a school must have possessed enough knowledge of the harassment[14] that it reasonably could have responded with remedial measures to address that harassment. *Mathis*, 782 F.Supp.2d at 549. To avoid liability, the school must merely respond to known peer harassment in a manner that is not clearly unreasonable. *Id.* Title IX liability can flow from two "harassment" time periods: (1) when the school exhibits deliberate indifference before a harassing attack on a student by a fellow student, in a way that makes the student more vulnerable to the attack; and (2) when a school exhibits deliberate indifference after a harassing attack that causes a student to endure additional harassment. *Lopez*, 646 F.Supp.2d at 917.

The Court finds that Plaintiffs presented sufficient credible evidence that Defendant had actual knowledge of the sexually harassing behavior of ML. Defendant's employees knew, at least from kindergarten on, that ML was inappropriately touching other students. His preschool teacher and his kindergarten teacher were both aware of inappropriate touching in their classes. They did not pass that information on to the parents or to ML's first grade teacher. Similarly, ML's first grade teacher knew about the report from Vanderbilt and did not pass that information on to the parents. The evidence at trial reflected that ML had a pattern of sexual misconduct which was known by a cross-section of individuals in the school system. Each year, from pre-school to kindergarten to first

---

[14]    The Supreme Court did not limit Title IX liability to a school's knowledge of, and deliberate indifference to, the alleged harassment of a particular individual, but instead contemplated that Title IX claims could be based on the school's knowledge of, and deliberate indifference to, a particular harasser's conduct in general. *Lopez*, 646 F.Supp.2d at 916.

grade to second grade, reports of ML's inappropriate behavior were known to employees of Defendant and yet information was not shared.

The Court also finds that Defendant's response to the sexually harassing behavior was clearly unreasonable, such that it amounted to deliberate indifference. For example, Defendant failed to communicate honestly with the parents. MB's teacher failed to tell his parents that MB and two other boys were being segregated from the rest of the students and required to stay with the teacher at all times. The vice-principal and principal both failed to explain to MB's mother that the "ongoing investigation" they told her about in the April 2012 phone call involved alleged peer-on-peer sexual harassment of her child. They failed to explain why she needed to ask MB if anything inappropriate had happened at school.[15] Defendant never told MB's parents that the phone call was made because ML had admitted inappropriately touching their son.

BE's parents were not advised about the computer lab incident[16] until BE herself told them. The vice-principal told them nothing had happened. No one from the School told JA's parents about the movie incident. JA's parents reported to DCS that they were concerned about the lack of notification and information from the school. Trial Ex. 38.

Moreover, Defendant failed to communicate with ML's teachers about his ongoing inappropriate misconduct or the reasons for his Safety Plan. The School's guidance counselor

_____

[15]     "I asked her what she meant by 'inappropriate.' And what did she say? 'I can't tell you that until you talk to your child.'". Tr. 1 at p. 118. "Every time I would ask why did I get this phone call, she would change the subject . . ." *Id.* at p. 121. When MB's father spoke with the principal about the phone call, "She said she couldn't tell me anything." *Id.* at p. 174.

[16]     Defendant claims that with the incident involving BE, the Safety Plan for ML was simply not followed, so it is not evidence of deliberate indifference. The *response* to BE's complaint, however, had nothing to do with the Safety Plan - the Court must consider the School's behavior *after* the report of sexual abuse as well as before the abuse.

testified that there were no means by which accusations of peer-on-peer sexual abuse could be collected to identify behavioral threats to other children. Thus, Defendant could not advise teachers to be alert to previously-noted sexual and/or abusive behaviors. When Defendant developed a Safety Plan for ML to monitor his behavior, teachers were told only to monitor ML, not why and not what specific behaviors to guard against. The School's principal, when asked whether it would be useful, in terms of learning how to cope with a child, to have known about his prior conduct, responded, "That would be with any child." Tr. 3 at p. 167. She stated that the School had no means to access or store information about ML's prior inappropriate behavior - or such behavior of any of their children. *Id*. at pp. 167-68. She agreed that it would have been useful to have knowledge of what a child was accused of doing in the past to inform her impression of what he was charged with later. *Id*. at p. 168.

Defendant has argued that "privacy concerns" led to the failure to report or share information with other teachers or with parents. The law, however, allows the release of information to other school officials, including teachers, who are determined to have legitimate educational interests. 20 U.S.C. § 1232g (b)(1)(A). In addition, the law allows the release of information to appropriate persons, in connection with an emergency, if the knowledge of such information is necessary to protect the health or safety of the student or other persons. 20 U.S.C. § 1232g (b)(1)(I).

Defendant argues that its prompt response to receiving the phone call from DCS about ML is evidence of the lack of deliberate indifference. Defendant's employees met to develop a Safety Plan for ML. The plan it developed, however, was not explained to the appropriate persons and recommended a strategy (isolation or separation) which had not worked in the past. Although the deliberate indifference standard does not mean the Court can second guess a school's disciplinary

actions, the Court must act when the school's response to sexual harassment of students, or lack thereof, is clearly unreasonable in light of the circumstances. *Davis*, 526 U.S. at 648.

For these reasons, the Court finds that Defendant violated Plaintiffs' Title IX rights through its deliberate indifference to known peer-on-peer sexual harassment at East Robertson Elementary School.

## SECTION 1983 - FAILURE TO TRAIN

Plaintiffs contend that Defendant is liable under 42 U.S.C. § 1983 for its failure to train its employees in the proper methods and means to detect, prevent and treat peer-on-peer sexual abuse. Plaintiffs argue that Defendant's preoccupation with "privacy" over the safety of students evidences a lack of understanding and failure to train employees to keep students safe. The Court finds that Defendants' failures to train employees in this case amount to deliberate indifference and violate Section 1983.

There are limited circumstances in which an allegation of failure to train can be the basis for liability under Section 1983. *Lopez*, 646 F.Supp.2d at 912. Such liability may arise only where the governmental entity is deliberately indifferent by not training its employees adequately to address an obvious need. *Id*. To succeed on a failure to train claim, Plaintiffs must prove the following: (1) the training was inadequate for the tasks performed; (2) the inadequacy was the result of the Defendant's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Lopez*, 646 F.Supp.2d at 912; *Ellis v. Cleveland Municipal School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Defendant argues that its approach to preventing sexual harassment and bullying in the School was focused primarily on educating the students. The Court finds that the focus on educating

the students is not enough. Training for teachers is also necessary. In addition, preventing sexual abuse is only part of that training; dealing with reports of sexual abuse after the abuse has happened is also important. Defendant's failure to train its teachers and failure to have policies (including policies for providing help for victims) for dealing with peer-on-peer sexual harassment or abuse, reflects a deliberate indifference to the safety and needs of its students.

The School's guidance counselor testified that there was no training, during the time periods relevant to this action, for teachers and administrators[17] about recognizing the signs and symptoms of sexual abuse in children. Tr. 2 at pp. 118-19. Since the filing of this action, Defendant has added a training program for teachers on recognizing the symptoms of sexual abuse in children. *Id*. at p. 119. That training involves signs to watch for, things the child might be going through, and what to do after you have seen a sign of sexual abuse. *Id*. at 119-20. The guidance counselor testified that children usually do not disclose that information (if they have been abused) for guilt or fear or other reasons. *Id*.

Defendant recognized the dangers of sexual abuse to children, but it did not train its teachers to look for, avoid or report these same dangers.[18] For example, there was no training about signs to look for, no training about reporting sexual abuse, no training about notifying parents, no training about how to interview the children, no training about implementing a safety plan, and no training

---

[17]     There was a program for students, called Safe at Last, which taught children to be more assertive, to be protective of their bodies, what good touches and bad touches are, what the private parts of the body are, and to report any bad or uncomfortable touches. Tr. 2 at pp. 163-66.

[18]     Defendant has argued that its teachers received training during their college education which relates to these issues, but that training did not prove, in these instances, to be adequate or effective. Moreover, Defendant had no polices concerning this peer-on-peer sexual harassment to which teachers could refer if questions arose.

about changing interventions which did not work. The teachers testified that Defendant did not offer training in identifying signs and symptoms of sexual abuse in a child. *See e.g.,* Tr. 2 at p. 70 and pp. 186-87. One of the teachers testified that she understood that she was to report if the child would be in danger at home, not an in-school danger or incident. *Id*. at p. 69. The teachers testified that Defendant did not give them training in how to interview children. *Id*. at pp. 83 and 236. There was no evidence of record-keeping for allegations of abuse or training for such documentation.

With regard to the causal connection between the lack of training and the injury, Defendant's failure to train about what to do when an incident is reported led to the failure to report to parents, DCS and/or others at the School the incidents involving ML in preschool, kindergarten, first grade and second grade. The failure to train about how to handle a sexual abuse allegation led to the lack of sharing information with other employees in order to assure the safety of the children and to implement the Safety Plan for ML. The failure to train about interviewing children and responding to allegations of sexual abuse led to the victims in this case feeling as if *they* had done something wrong and feeling that they were punished for reporting the abuse. Moreover, the failure to record and document cases of abuse allowed ML's abuse to continue.

The Court finds that Defendant's failures in this regard amount to deliberate indifference to the safety and needs of students. Therefore, the Court finds that Defendant is liable under 42 U.S.C. § 1983 for its failure to train employees about the proper ways to recognize, report, document, deal with peer-on-peer sexual harassment, and help victims.

**TENNESSEE GOVERNMENTAL TORT LIABILITY ACT**

Plaintiffs also bring a claim for negligence under the Tennessee Governmental Tort Liability Act ("TGTLA"). Because both the Title IX and the failure to train claims require <u>deliberate</u>

indifference, the Defendants' conduct was intentional, not negligent. Thus, Plaintiffs' TGTLA claim is DISMISSED.

## DAMAGES

MB moved to a private school because of these incidents. He is entitled to the tuition amounts for the private school from the date he moved there through fifth grade, when he would have left East Robertson Elementary had these things not occurred. MB is entitled to the costs of his counseling/therapy from the date he began the counseling until the date of trial. MB is also entitled to an amount of money damages for emotional distress.

BE is entitled to the costs of her counseling/therapy from the date she began the counseling until the date of trial and to an amount of money damages for emotional distress.

JA is entitled to the costs of his counseling/therapy from the date he began the counseling until the date of trial and to an amount of money damages for emotional distress.

By December 15, 2014, the Plaintiffs shall file briefs with documentation as to the amounts of their damages as set forth above. Defendants will have until December 29, 2014, to file any Response.

Plaintiffs are the "prevailing parties" in this action and shall file any Motion for Attorneys' Fees in accordance with the Local Rules of Court.

## CONCLUSION

The evidence at trial demonstrated a serious lack of sensitivity by the Defendant school system to peer-on-peer sexual harassment and inappropriate touching. Known information was not shared with parents or other school employees, despite the need to prevent and deal properly with such abuse. Children who were victims of such abuse were shamed, not believed, made to apologize,

told to drop it, or required to remain with the perpetrator at all times, all in front of the other children. Parents who were genuinely concerned about their children were treated with indifference and lied to about what was really happening.  For all these reasons, the Court finds that Defendant is liable to Plaintiffs under Title IX and Section 1983 for its deliberate indifference in this case.

IT IS SO ORDERED.

_Todd Campbell_
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE